BILLIE JEAN AMMONS,

        Plaintiff,

    v.

COOK COUNTY OF ILLINOIS, a body politic, and THOMAS DART, Sheriff of Cook County,

        Defendants.

No. 11 CV 5010

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Billie Jean Ammons worked as a Sheriff's Deputy in the Cook County Sheriff's Department. In 2003, Ammons was injured when part of her spine separated from her hipbones. Because her injury required her to take time off of work, she applied for and received certification to do so under the Family Medical Leave Act. In 2007 and again in 2009, Ammons took a written exam to qualify for promotion to the position of sergeant. Ammons passed the 2007 exam, but was not promoted. Ammons also passed the 2009 exam, but was initially deemed "not qualified" for promotion because of her low attendance at work. In 2010, following implementation of new department procedures, Ammons was deemed eligible for promotion, but she did not receive one. Ammons alleges that the decisions not to promote her violated the FMLA, and brings a claim against Thomas Dart, Sheriff of Cook County, under that Act. Cook County, Illinois, is named as a defendant pursuant to indemnification provisions in Illinois state law. Defendants move for

summary judgment under Rule 56 of the Federal Rules of Civil Procedure, and argue that there is no genuine dispute of material fact that precludes judgment in their favor. For the reasons discussed below, I grant defendants' motion.

## I.    Legal Standard

Summary judgment may be granted where "there is no genuine issue of material fact and . . . the movant is entitled to judgment as a matter of law." *Hussey v. Milwaukee Cnty.*, 740 F.3d 1139, 1142 (7th Cir. 2014) (quoting *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether summary judgment is appropriate, I must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011) (quoting *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 589 (7th Cir. 2008)).

## II.    Facts

### A.    Billie Jean Ammons's Employment and Injury

In 1998, Billie Jean Ammons was hired as a Sheriff's Deputy in the Court Services section of the Cook County Sheriff's Department. [91] ¶ 1.[1] In 2003, while

---

[1] Citations to the record are designated by the document number as reflected on the Court's docket, enclosed in brackets. The facts related in this opinion are taken largely from Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Uncontested Facts, [87],

still employed as a Sheriff's Deputy, Ammons injured her sacroiliac joint (the joint that connects part of Ammons's spine to her hipbones). *See id.* ¶ 5.[2] The injury required Ammons to take time off of work periodically in order to rest. *Id.* In 2004, Ammons applied for and received certification of her sacroiliac disability under the Family Medical Leave Act, *id.* ¶ 6, which permitted Ammons to take off from work up to 12 weeks per year of medical leave relating to that injury, [87] ¶ 10. Ammons renewed her FMLA certification each year, as required by the Act, [91] ¶ 6, and used that certification to take intermittent FMLA leave, [87] ¶ 10. None of Ammons's requests to take FMLA leave was denied by the Sheriff's Department. *Id.* ¶ 11.

## B. Promotion Procedures in the Sheriff's Department

Deputies in the Sheriff's Department who sought a promotion to sergeant were obligated to take a promotion exam, administered by the Sheriff's Merit Board. *Id.* ¶ 14. Candidates who passed the exam would then be placed on a corresponding "promotion list," which would remain active for the ensuing two years. *Id.* Any

_____

and Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Uncontested Facts, [91], which set forth the parties' positions concerning the facts material to this motion.

[2] In multiple instances, the parties state that they have "insufficient information" with which to either admit or deny the statement of fact presented by the opposing party. *See, e.g.,* [87] ¶¶ 15, 23, 29, 30–31, 45, 55, 57, 62–63; [91] ¶ 5. Such responses are inappropriate at the summary-judgment stage and constitute *de facto* admissions. *See Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 626 (7th Cir. 1998) (observing that the non-moving party's assertion that he was "without knowledge or information sufficient" to respond to the moving party's statements of fact constituted "an admission, not a denial," of those facts); *McGuire v. United Parcel Serv.*, 152 F.3d 673, 674–75 (7th Cir. 1998) (similar); *see also* N.D. Ill. Local Rule 56.1(b) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted *unless controverted by* the statement of the opposing party.") (emphasis added); *id.* 56.1(a) ("All material facts set forth in the statement filed [by the opposing party] will be deemed admitted *unless controverted by* the statement of the moving party.") (emphasis added).

promotions awarded within a given two-year period would be offered only to candidates whose names appeared on the relevant promotion list. *Id.*[3]

### 1. Pre-2010 Procedures

Prior to 2010, promotion candidates could be deemed "not qualified" for promotion because of low attendance at work. [87] ¶ 17. However, when assessing employees' attendance records—and thus their qualifications for promotion—use of FMLA leave was considered a "mitigating circumstance." *Id.* ¶ 24; *see also* Second Connelly Affidavit, [74-2] at 4.

### 2. The "SEAM" Procedures

In the spring of 2010, the Sheriff implemented new employment and promotion procedures, set forth in the Sheriff's Employment Action Manual (SEAM). [87] ¶ 17. SEAM procedures established that candidates whose names appeared on a preliminary promotion list would be assessed in—and receive a

---

[3] Ammons disputes that all promotions were actually made from the relevant list, contending instead that, on occasion, at least some promotions were awarded to candidates whose names did not appear on the list. *See* [87] ¶ 14. However, Ammons fails to support her contention with citations to the record or other materials, as required by local rule. *See* N.D. Ill. Local Rule 56.1(b)(3) (stating that responses to the paragraphs in the moving party's statement of facts must "includ[e], in the case of any disagreement, *specific references to the affidavits, parts of the record, and other supporting materials* relied upon") (emphasis added). Consequently, Ammons's response to this statement is treated not as a denial, but as an admission of its truth. *See id.* (noting that "facts set forth in the statement required of the moving party *will be deemed to be admitted* unless controverted by the statement of the opposing party) (emphasis added); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure [by the non-moving party] to respond [to the moving party's Rule 56.1 statement] as mandated by the local rules results in an admission." (citing *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000))); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818–19 (7th Cir. 2004) (concluding that the district court did not abuse its discretion in striking the plaintiff's responses to the defendant's statement of facts where those responses "simply denied an allegation and provided no citation whatsoever" in support).

composite promotion score based on—five areas, including: (1) attendance (worth 20% of the candidate's overall score); (2) responses to "operational" interview questions (12.5%); (3) "personal attributes" exhibited during interview (32.5%); (4) the candidate's written exam score (17.5%); and (5) a writing sample (17.5%). *Id.* ¶¶ 19–20. The candidates would then be ranked according to their composite scores, with the highest-scoring candidate receiving the highest rank on the promotion list. *See id.* ¶ 21.

To compute the attendance score, the SEAM further provided that two percentages must first be determined: (1) the percentage of "unused medical time"[4] over the course of the candidate's career; and (2) the percentage of the candidate's unused medical time over the past 18 months. *Id.* ¶ 25. While a candidate's percentage unused career medical leave would be worth 12.5% of their composite promotion score, the candidate's percentage unused leave over the past 18 months would be worth only 7.5% of their overall score (totaling 20% for attendance, generally). *Id.* ¶ 20. Medical leave taken pursuant to the FMLA would be considered time taken under "mitigating circumstances," and thus would be added back to the candidate's unused-leave balance. *Id.* ¶¶ 25–29. In other words, leave hours taken as FMLA leave would be treated as though the candidate had worked those hours. *See id.* ¶ 35.

---

[4] "Unused medical time" means the medical leave that a candidate has accrued but not used, and includes medical leave that is *considered* not to have been used because it was used pursuant to the FMLA.

### C.    The 2008–2009 Promotion Cycle

Ammons took and passed the 2007 promotion exam. *See* [91] ¶ 4. She received a promotion interview, and was interviewed by Kelly Jackson, Chief of Court Services. *Id.* ¶ 10. During the interview, Jackson consulted Ammons's attendance record, but no other document. *Id.* ¶ 11. The 2007 promotion list remained valid until the list for the 2009 promotion exam was certified by the Sheriff's Merit Board. *Id.* ¶ 16. Ammons was not promoted from the 2007 list. *See id.* ¶ 13.

### D.    The 2010–2011 Promotion Cycle

Ammons took and passed the 2009 promotion exam. *See id.* ¶ 23; [91] ¶ 4. All candidates who passed the 2009 written exam—including Ammons—were placed on a preliminary promotion list, which was certified by the Merit Board on October 27, 2009. [87] ¶ 15. Initially, Ammons was deemed "not qualified" for promotion from the 2009 list because of low attendance. *Id.* ¶ 17. But when the SEAM went into effect the next spring, *id.*, Ammons was deemed eligible for promotion, *id.* ¶ 23. Candidates whose names appeared on the 2009 promotion list were interviewed and ranked according to SEAM procedures before promotions were awarded based on that list. *See id.* ¶¶ 15, 23. Rankings were finalized on August 9, 2010. *Id.* ¶ 41.

#### 1.    *Ammons's Attendance Score*

Wendy Bernard, a payroll supervisor in the Personnel Department of the Sheriff's Office, *id.* ¶ 6, analyzed the attendance records of each candidate who passed the 2009 promotion examination—including Ammons—and summarized the

results of her analysis in a spreadsheet, *see id.* ¶¶ 30–32. According to Bernard's analysis, as of May 3, 2010, Ammons had used all but 1.59 hours of the medical leave she had accrued over the course of her career. *Id.* ¶ 33. Of the leave hours used, Ammons had taken 332 as FMLA leave, so Bernard treated them as accrued-but-unused medical time (*i.e.*, as though Ammons had worked those hours). *See id.* Bernard therefore added 332 hours to the 1.59 hours of unused time, obtaining a total of 333.59 hours of total unused career medical leave. *See id.* According to Bernard's calculations, 333.59 hours represented approximately 28% of the total number of leave hours Ammons had accrued throughout her career. *Id.*[5]

---

[5] Ammons disputes that the 333.59 hours accurately reflected her career medical-leave balance. *See* [87] ¶ 33. Specifically, Ammons asserts that her FMLA leave and "duty disability" leave were not properly credited to her overall balance. *Id.* Similarly, Ammons contends in her own Rule 56.1 Statement of Uncontested Facts, [91]: (1) that her available medical-leave hours were underreported or otherwise credited improperly, *see* [91] ¶¶ 20, 26; and (2) that had those hours been credited properly, Ammons would have had 90% unused career medical leave instead of the 28% that Bernard obtained, *see id.* ¶ 21. However, none of Ammons's assertions is adequately supported.

First, Ammons provides no evidentiary support for her contention that the 333.59 hours of unused medical leave reported by Bernard did not accurately reflect Ammons's career medical-leave balance as of May 2010. *See* [87] ¶ 33. As explained above, Ammons's failure to support her response to defendants' Rule 56.1 statement, as required by the Local Rules, converts her would-be denial into an admission. *See* N.D. Ill. Local Rule 56.1(b)(3).

Second, in support of Ammons's own statements that her medical-leave hours were underreported or otherwise credited improperly, Ammons cites only to her own affidavit. *See* [91] ¶ 20 (citing Plaintiff's Affidavit, [95-1] ¶ 17); *id.* ¶ 26 (citing Plaintiff's Affidavit, [95-1] ¶ 23). While an affidavit may be used to support an assertion of fact, *see* Fed. R. Civ. P. 56(c)(1)(A); N.D. Ill. Local Rule 56.1(b)(3)(C), the affidavit paragraphs cited here (17, 23) contain only near-verbatim restatements of what Ammons asserts in her Rule 56.1 statement, [91]. *Compare, e.g.*, Ammons's Statement of Uncontested Facts, [91] ¶ 20 ("Plaintiff discovered on reviewing the documents . . . that Sheriff Dart's personnel had understated and underreported Plaintiff's available medical leave . . . .") *with* Ammons's Affidavit, [95-1] ¶ 17 ("I discovered on reviewing the documents . . . that Sheriff Dart's personnel had understated and underreported my available medical leave . . . ."). None of the referenced affidavit paragraphs "set[s] out facts [based on personal knowledge] that would be admissible" as evidence in court. Fed. R. Civ. P. 56(c)(4). Without those facts, the referenced affidavit paragraphs present only conclusory allegations, and such allegations are insufficient to create a genuine issue of material fact. *See Gessert v. United States*, 703

Bernard also analyzed Ammons's medical leave taken within the 18 months prior to May 13, 2010. *See id.* ¶¶ 32, 34. According to that analysis, Ammons had used (within those 18 months) 39 hours of non-FMLA medical leave, and had accrued—but not used—105.3 hours of medical leave during that time. *Id.* ¶ 34.

---

F.3d 1028, 1035 (7th Cir. 2013) ("[C]onclusory allegations devoid of factual support do not preclude summary judgment.") (citation omitted). Moreover, paragraph 23 of the affidavit is presented "on information and belief," *see* [95-1] ¶ 23, which is "not enough to satisfy the personal knowledge requirement of affidavits," *Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000).

Ammons also cites to her affidavit in support of her Rule 56.1 statement that, had Ammons's medical leave been tabulated properly, her attendance score would have shown 90% unused career medical leave (instead of 28%). *See* [91] ¶ 21 (citing Ammons's Affidavit, [95-1] ¶ 18). But again, the referenced affidavit paragraph contains only conclusory allegations that simply restate the assertions appearing in Ammons's Rule 56.1 statement, [91]. Such allegations are not enough to create a genuine dispute of fact that defeats summary judgment. *See Gessert*, 703 F.3d at 1035.

In an effort to show that Bernard *must* have tabulated Ammons's medical leave incorrectly (and thus arrived at an erroneous attendance score), Ammons also asserts that Bernard's calculations "presuppose that [Ammons took off] *more than 802 hours (more than 4-1/2 months) of non-FMLA, non-[disability] medical time* throughout her career, which (as Defendants can quickly determine) is substantially erroneous and overstated." [87] ¶ 35. But Ammons's attempt to here again create a dispute of fact concerning her attendance score fails. Ammons points to no evidence in support of her contention, and in suggesting that defendants "can quickly determine" whether Bernard's calculations were erroneous, Ammons has it backward. It is not *defendants'* burden to corroborate Ammons's otherwise-unsupported allegations; rather, as the non-moving party, it is Ammons's obligation to establish that there is a genuine disagreement of material fact by pointing to "specific references to . . . affidavits, parts of the record, [or] other supporting materials." N.D. Ill. Local Rule 56.1(b)(3)(B); *see also* Fed. R. Civ. P. 56(c)(1).

Because I find that Ammons has failed to support as required her assertions that her career medical-leave balance was analyzed, tabulated, or otherwise calculated incorrectly in 2010, I consider as undisputed defendants' version of the facts concerning any such analysis, tabulation, or calculation. *See* Fed. R. Civ. P. 56(e) (noting that "[i]f a party fails to properly support an assertion of fact or . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"); *see also* N.D. Ill. Local Rule 56.1(b)(3) (warning that, "unless controverted by the statement of the opposing party," all material facts presented in the moving party's Rule 56.1 statement "will be deemed to be admitted"). However, I will view any such facts, as I must, in Ammons's favor. *See Ames*, 629 F.3d at 668.

Those 105.3 unused hours represented approximately 72% of the total number of medical-leave hours Ammons had accrued in that time period. *Id.*[6]

Bernard included both the "28%" (unused career medical leave) and "72%" (unused 18-month medical leave) figures for Ammons in a summary spreadsheet. *See id.* ¶ 32–34. Bernard provided the spreadsheet to Kevin Connelly, First Assistant Chief Deputy of Court Services. *See id.* ¶¶ 31–34. The spreadsheet indicated that Ammons had used 332 hours of "FMLA/A" leave. Exhibit 1 to the Bernard Deposition, [74-7] at 1. Connelly later testified during his deposition that, when he prepared the final rank-ordered promotion list, he did not know whether Ammons had been certified to take FMLA leave. *See* [87] ¶ 44; Connelly Deposition, [74-4] at 44–57.

### 2. *Ammons's Promotion Interview*

In addition to her attendance score, part of Ammons's composite promotion score in 2010 would be based on her performance during an interview. *See* [87]

---

[6] Ammons disputes that, within the 18 months leading up to May 2010, she used 39 hours of medical leave that were not FMLA-approved, and also that she had accrued only 105.3 hours of (unused) medical leave during that time. *See* [87] ¶ 34. Here again, however, Ammons fails to provide any support for her assertion that her attendance scores were tabulated or otherwise calculated incorrectly. Indeed, Ammons includes no citations whatsoever in her response to defendants' Rule 56.1 statement on this point. She instead argues (again without support) that her percentage 18-month unused medical leave should have totaled 100%, not 72%. *See id.* Ammons's unsupported allegations concerning the calculation of her 18-month attendance score are insufficient to demonstrate the existence of a genuine dispute of material fact that defeats summary judgment. *See Gessert*, 703 F.3d at 1035. And because I find that Ammons has failed to support her assertion as required, I consider as undisputed defendants' version of the facts concerning the analysis, tabulation, or calculation of Ammons's 18-month medical-leave balance. *See* Fed. R. Civ. P. 56(e); N.D. Ill. Local Rule 56.1(b)(3). I will view any such facts in the light most favorable to Ammons, however.

¶¶ 19–21. Although Ammons had passed the 2009 exam (and was deemed eligible for promotion under the SEAM), *see id.* ¶ 23, she did not initially receive an interview, [91] ¶ 14.[7] Because she had not yet received a promotion interview as of May 10, 2010, Ammons filed on that date an internal "grievance" complaint. [87] ¶ 54. A hearing on Ammons's grievance complaint was scheduled for June 8, 2010; her promotion interview was scheduled for later that same day, at the same location. *See id.* ¶¶ 56, 58; [91] ¶ 14.[8] On June 8, 2010, after Ammons's grievance hearing had concluded and while she waited for her promotion interview to begin, Kelly Jackson, Chief of Court Services, stated loudly—and within earshot of the personnel who would be conducting Ammons's promotion interview—that Jackson needed to give Ammons a copy her grievance report. [91] ¶ 14.[9] Ammons's grievance complaint was ultimately denied because, at the time she filed her complaint, only

---

[7] Defendants deny that Ammons did not initially receive an interview, stating that she received an interview on June 8, 2010. *See* [91] ¶ 14 (citing Exhibit 1 to the Ammons Deposition, [74-3]). I note first that Exhibit 1 to the Ammons Deposition does not provide the information defendants claim it does—that is, Exhibit 1 does not describe the date on which Ammons was ultimately interviewed. *See* [74-3] at 88. However, inspection of Exhibit 2 to the Ammons Deposition does confirm that Ammons was interviewed on June 8, 2014. *See id.* at 89. Regardless, defendants' (presumably typographical) citation error is inconsequential because it is reasonable to infer from the fact that Ammons was not interviewed until June 8, 2010—more than seven months after the preliminary promotion list was certified on October 27, 2009, *see* [87] ¶ 15—that she "did not initially receive an interview" after passing the written 2009 promotion exam.

[8] Defendants deny these assertions and state that, in any event, they are immaterial to Ammons's claim under the FMLA. *See* [91] ¶ 14. Though I agree that the location and timing of Ammons's grievance hearing are not material facts in and of themselves, they do provide context for other facts that are material to Ammons's claim, and thus I construe them in Ammons's favor.

[9] Defendants dispute the truth of these assertions. *See* [91] ¶ 14. However, defendants' denial is unsupported and thus operates as an admission under the Local Rules. *See* N.D. Ill. Local Rule 56.1(a).

15 of the 120 candidates who had passed the 2009 written exam had been contacted about scheduling their interview, and no interviews had yet been conducted. [87] ¶¶ 55, 57.

### 3. Ammons's Composite Score and Rank

Before determining the candidates' respective composite scores, Kevin Connelly (First Assistant Chief Deputy Sheriff, *id.* ¶ 5) obtained each candidate's attendance data from the Personnel Department and input that information, as well as information concerning the other component scores (such as interview and written-exam scores) into the candidates' individual score sheets, *id.* ¶ 28; *see also* Connelly Deposition, [74-4] at 27:14–28:8. Connelly then used the score sheets to calculate each candidate's composite promotion score and corresponding rank (as compared to the other candidates). *See* [87] ¶ 28. Ammons received a composite score of 87.7. *Id.* ¶ 40; Ammons's Promotion Score Sheet, [74-5] at 18–19.[10] Based on

---

[10] Ammons disputes that her composite score was calculated correctly, and states that instead it should have been at least a 91. *See* [87] ¶ 40–41; *see also* [91] ¶ 33 (averring that, had her medical leave been credited properly, her composite score would have risen at least four points). Here again, however, Ammons fails to provide any support for her assertion that her score was calculated incorrectly or otherwise based on incorrect components. Although in her own Rule 56.1 statement, [91], Ammons does refer to the record for support, *see* [91] ¶ 33 (citing the Connelly Deposition, [74-4] at 29), the referenced portion fails to provide the evidence Ammons needs. The identified transcript page speaks only to how attendance scores generally were weighted when a candidate's composite promotion score was calculated. The identified portion of the transcript says nothing about how Ammons's own attendance score was calculated in 2010, or whether, if that component of her promotion score was indeed calculated inaccurately, Ammons's overall composite score would have changed (and by how much). *See* [74-4] at 29. Nor does Ammons provide any support for her assertion that her composite score was derived from "inaccurately low figures," *see* [91] ¶ 31. Although this statement, too, cites to the record for support, *see id.* (citing Exhibit 7 to the Connelly Deposition, [74-5]), the cited exhibit is merely a rank-ordered list of candidate officers who passed the 2009 written promotion exam and their corresponding composite scores. *See* [74-5] at 42–44. The exhibit says nothing about how the composite scores were calculated, let alone how Ammons's own composite score might

her composite score of 87.7, Ammons was ranked 41 out of 124 candidates for promotion to Sergeant during the 2010–2011 promotion cycle. *Id.* ¶ 42.

### 4. Promotions Awarded in 2010–2011

Twenty-two candidates were awarded promotions during the 2010–2011 cycle. *Id.* ¶ 46. The lowest-scoring candidate who received a promotion scored a 90.225 overall, *id.*, and none of the candidates who were promoted ranked lower than number 25 on the rank-ordered promotion list, *id.* ¶ 64. Ammons was considered for a promotion each time a sergeant position became open during the 2010–2011 promotion cycle, *id.* ¶ 45, but was never promoted, *id.* ¶ 13. Of the 22 officers promoted during the 2010–2011 cycle, 11 individuals had (or had had) FMLA certifications, the earliest dating back to 2004. *Id.* ¶ 62. Three of those individuals had obtained at least four FMLA certifications, including one individual who had obtained ten certifications since 2005. *Id.* ¶ 63.

### E. Procedural History

In July 2011, Ammons filed a complaint alleging violation of the FMLA and the Americans with Disabilities Act. [1]. Ammons amended her complaint on February 15, 2012, which named as defendants Thomas Dart, Sheriff of Cook County, and Cook County as indemnifier under Illinois law. *See* [19] ¶ 20. Ammons's non-FMLA claims were dismissed on March 15, 2012. [87] ¶ 8. Before me is defendants' motion for summary judgment on Ammons's FMLA claim. [72, 73].

---

have increased had her component scores (such as attendance) been higher. I consider as undisputed defendants' version of the facts concerning Ammons's composite score and its accuracy—including to the extent Ammons's score affected her rank among other candidates on the promotion list. *See* Fed. R. Civ. P. 56(e); N.D. Ill. Local Rule 56.1(b)(3).

## III.   Analysis

### A.   Interference Claim[11]

The FMLA permits eligible employees to take off from work up to 12 weeks of unpaid leave each year due to a "serious health condition" that renders the employee unable to perform his or her job. *Ames*, 629 F.3d at 668 (citing 29 U.S.C. § 2612(a)(1)(D)). Where an employee has a statutory right to take FMLA leave, the FMLA prohibits the employer from "interfer[ing] with, restrain[ing] or deny[ing] the exercise of" that right. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780 (7th Cir. 2013) (citing 29 U.S.C. § 2615(a)(1)). To succeed on an interference claim under the FMLA, the plaintiff must show: (1) that she was eligible for FMLA protection; (2) that her employer was also covered by the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she provided sufficient notice of her intent to take FMLA leave; and (5) that her employer denied her benefits to which she was entitled. *See id.* (quoting *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010)).

Here, defendants do not dispute that Ammons can satisfy the first four elements of an FMLA interference claim. Defendants argue that Ammons cannot show that defendants denied her benefits to which was entitled under the Act. *See* [73] at 3. Ammons cannot make such a showing, defendants argue, because they never denied Ammons's requests to take FMLA leave. *See id.* As Ammons does not

---

[11] The amended complaint, [19], does not specify which type of FMLA claim ("interference" or "retaliation") Ammons is asserting against defendants. Although the more logical inference from the allegations set forth in the complaint is that Ammons asserts only a retaliation claim, defendants address both types of claims in their motion.

dispute this contention (and in her brief addresses only a "retaliation" claim, *see* [85] at 4–14), defendants' motion for summary judgment is granted insofar as it pertains to an interference claim under the FMLA.

## B.   Retaliation Claim

The FMLA not only prevents employers from interfering with employees' exercise of their FMLA rights, but also prohibits employers from retaliating against an employee who exercises, or attempts to exercise, those rights. *See James*, 707 F.3d at 781 (citing 29 U.S.C. § 2615(a)(2)). In other words, employers cannot use "as a negative factor in promotion, termination, [or] other employment decisions" the fact that an employee has used, or plans to use, FMLA leave. *Id.* (citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008)). Employees seeking redress for employer retaliation based on the use of FMLA leave may proceed using either the direct or indirect method of proof. *See Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006)).

### 1.   *The 2010–2011 Promotion Cycle*

Defendants argue that Ammons cannot establish an FMLA retaliation claim under either the direct or indirect method of proof. *See, e.g.*, [73] at 5, 11.

#### a.   Direct Method of Proof

To prevail on an FMLA retaliation claim using the direct method of proof, the plaintiff must show: (1) that she was engaged in a protected activity; (2) that her employer took an "adverse employment action" against her; and (3) that there is a "causal connection" between the protected activity and the adverse employment

action. *Pagel*, 695 F.3d at 631 (citing *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009)). A causal connection may be established either by showing an admission of retaliation by the employer, or by "constructing a convincing mosaic of circumstantial evidence" from which a jury can infer retaliatory intent. *Scruggs v. Carrier Corp.*, 688 F.3d 821, 827 (7th Cir. 2010) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)); *see also Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009) (citing *Caskey*, 535 F.3d at 593). Circumstantial evidence may include "suspicious timing, ambiguous . . . statements, or behavior toward or comments directed at other employees in the protected group." *Long*, 585 F.3d at 350 (citing *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007)).

Here, defendants do not dispute that in taking FMLA leave, Ammons was engaged in a protected activity, or that defendants took an "adverse employment action" against her by declining to promote her to sergeant. Defendants argue that Ammons cannot prove retaliation under the direct method of proof because she cannot show—either through direct or circumstantial evidence—that defendants declined to promote her *because* she took FMLA leave. *See* [73] at 5. Defendants, in short, maintain that Ammons cannot establish the requisite "causal connection" between her use of FMLA leave and the fact that she was not promoted.

Direct evidence of a causal connection in this case would consist essentially of an admission by defendants that they refused to promote Ammons because she took FMLA-related medical leave. *See Long*, 585 F.3d at 350. Ammons does not argue

that defendants have made such an admission, and points to no evidence that such an admission occurred. Thus, to defeat summary judgment on her FMLA claim under the direct method of proof, Ammons must show that there is circumstantial evidence from which a reasonable jury could infer retaliation. *See id.*

Defendants contend that there is no evidence from which a jury could infer retaliation, because the procedures defendants employed to promote officers during the 2010–2011 promotion cycle (*i.e.*, the SEAM procedures) did not count use of FMLA leave against an officer's chances of receiving a promotion. *See* [73] at 11. Ammons's theory—although not articulated very clearly—appears to be that a reasonable jury could infer retaliation against Ammons personally because the evidence shows that certain employees of the Cook County Sheriff's Department— Wendy Bernard, Kelly Jackson, and Kevin Connelly—deprived Ammons of a promotion because she had used FMLA leave, first by miscalculating her attendance scores (Bernard), then by attempting to prejudice Ammons's interviewers against her (Jackson), and finally by "signing off" on a composite promotion score derived from inaccurately-graded or otherwise miscalculated component scores (Connelly). *See* [85] at 5–11.

Ammons's argument suffers from multiple defects. First, and as a threshold matter, Ammons's argument is entirely new. In her amended complaint, Ammons alleges that defendants violated the FMLA because they implemented a policy that "restricts promotion opportunities . . . by stating a minimum amount of available medical leave" that an officer must have "in order to qualify for promotion." [19]

¶ 11. Ammons alleges that, because she took FMLA leave, she did not have the requisite minimum amount of medical leave left available to her, and thus was ineligible for promotion under defendants' policy. *See id.* ¶ 12. Nowhere in her amended complaint did Ammons include any allegations suggesting that other employees in the Sheriff's Department intentionally miscalculated, mis-tabulated, or otherwise mis-graded components of her promotion score. Only now, in responding to defendants' motion for summary judgment, does Ammons allege anything of the sort.

Ammons, in short, has attempted to amend her complaint through her response to defendants' motion for summary judgment. Such a last-minute switch is not typically permitted. *See, e.g.*, *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 606 (7th Cir. 2000) (noting that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment" (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996))); *Johnson v. Cypress Hill*, 641 F.3d 867, 873 (7th Cir. 2011) (observing that "[t]here must be a point at which a plaintiff makes a commitment to the theory of [her] case," and that changing one's claims "on the eve of summary judgment is exactly the sort of switcheroo we have counseled against" (citing *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993); *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir. 1999))). Ammons filed her amended complaint in this case on February 15, 2012, *see* [19], and discovery closed almost a year later in January 2014, *see* [59]: Ammons therefore had ample time in which to seek leave to further

amend her complaint if she felt that the evidence uncovered during those intervening 11 months had changed her theory of the case.

On the other hand, defendants did not complain in their reply brief about Ammons's "switcheroo," and instead responded to the arguments she proffered in her opposition brief. *See* [92]. Accordingly, I will assume that defendants were not prejudiced by Ammons's last-minute change of theory, and I will consider the (new) arguments she has made in response to defendants' motion. *Cf. Johnson*, 641 F.3d at 872–73 (prohibiting a plaintiff from altering its theory of the case at summary judgment because such a last-minute change would be prejudicial to the defendant); *Ryan v. Ill. Dep't of Children and Family Servs.*, 185 F.3d 751, 764 (7th Cir. 1999) (concluding that even though the plaintiffs' complaint had identified the wrong statute as the basis for their claim, the mistake was "of no moment," in part because the defendants expressed no surprise when the plaintiffs corrected the error in their opposition to a motion for summary judgment).

The second issue with Ammons's (new) argument—and the more problematic one for Ammons—is that the evidence does not support it.

### i. Wendy Bernard

The first part of Ammons's argument is that a jury could reasonably infer from the evidence that Wendy Bernard, a payroll supervisor in the Sheriff's Personnel Department, intentionally miscalculated or mis-tabulated Ammons's attendance scores (which ultimately contributed to Ammons's composite promotion score) because Ammons had taken FMLA leave. *See* [85] at 7–10. But for a jury to

reasonably infer from the evidence that Bernard *intentionally* miscalculated or mis-tabulated Ammons's attendance data, the jury would first have to conclude that Bernard did in fact miscalculate or mis-tabulate those scores. The evidence supports no such conclusion.

The facts as presented by defendants show that, as of May 3, 2010—when Bernard analyzed Ammons's attendance records for the purposes of determining the attendance-score portion of her overall promotion score—Bernard found that Ammons had used all but 1.59 hours of the medical leave she had accrued over the course of her career. After adding to that figure the number of hours Ammons had taken off as FMLA leave (332), Bernard determined that Ammons still had available to her approximately 28% of the total number of medical-leave hours she had accrued during her employment with the Sheriff's Department. *See* [87] ¶¶ 32–33. Bernard also determined that, during the 18 months prior to May 2010, Ammons had earned (but not used) 105.3 hours of medical leave, and thus still had available to her approximately 72% of the total number of leave hours she had accrued during that period. *See* [87] ¶ 34. These were the numbers that Bernard passed along to Kevin Connelly for inclusion in Ammons's composite score. *See id.* ¶¶ 28, 32–34.

Ammons posits that the attendance figures Bernard used in her analysis were incorrect—and that, consequently, Bernard's calculations based on those figures were also incorrect. However, as explained above at footnotes 5 and 6, Ammons provides no evidentiary support whatsoever for this position: her

unsupported statements amount (at best) to conclusory allegations, which are insufficient to create a genuine dispute of fact precluding summary judgment. *See Gessert v. United States*, 703 F.3d 1028, 1035 (7th Cir. 2013) (citation omitted). Indeed, Ammons has in effect admitted that her records were as defendants contend they were, and that Bernard's analysis of those records was accurate. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (concluding that a failure by the non-moving party to respond "as mandated by the local rules results in an admission") (citation omitted).

When viewing the facts surrounding Bernard's calculations in the light most favorable to Ammons, a reasonable jury could not infer from them an intent by Bernard to miscalculate Ammons's attendance score. The facts, for the purposes of this motion, show that Bernard never miscalculated at all.

But even assuming that Bernard did make an error, Ammons points to no evidence suggesting that Bernard made the error intentionally or, alternatively, that she willfully disregarded a blatant mistake in Ammons's attendance records.[12] In support of her argument that Bernard's behavior was suspicious, Ammons contends: (1) that Bernard added back to Ammons's medical-leave balance only one kind of FMLA leave, whereas more than one type should have been counted, *see* [85] at 8; (2) that Bernard's calculations "presuppose" Ammons to have used

---

[12] I note that in several instances, Ammons purports to cite to the record or other materials in support of her arguments, but fails to provide the relevant exhibit or page numbers. *See, e.g.*, [85] at 8 (citing to "Bernard Dep. Ex. , page ; Affidavit of Plaintiff, paras. 22-23"). I permitted Ammons to file a revised version of her brief, complete with the missing exhibit and page numbers. *See* [109]. None was provided. Thus, to the extent such exhibit and page numbers are missing from citations in Ammons's papers, I will disregard those citations.

approximately 1,134 hours of medical leave (including 802 hours of non-FMLA leave) over the course of her career, *see id.*; and (3) that Ammons cannot reasonably be presumed to have taken the 39 hours of non-FMLA leave Bernard claimed Ammons took during the 18 months before May 2010, because, if Ammons had taken that much non-FMLA leave, she would have been disciplined or placed on "proof status" (and she was not), *see id.* at 7, 9.[13] But none of these "facts" suggests an intent to discriminate against Ammons.

Even if Ammons is correct that Bernard failed to credit to Ammons's medical-leave balance all types of FMLA leave taken by Ammons, there is no indication that the error was at all purposeful. According to Ammons, Bernard's calculations are suspect because they "presuppose" Ammons to have used 802 hours of non-FMLA leave over the course of her career. *See* [85] at 8. Ammons fails to explain why that "presupposition" is unreasonable. According to Ammons, she began working for defendants in 1998. [91] ¶ 1. Bernard performed the relevant calculations in 2010. [87] ¶ 32. Thus, the career-based attendance figures that Bernard consulted represented *12 years'* worth of Ammons's employment. Assuming that Ammons worked 8-hour days during this 12-year period, Bernard's "presupposition" that Ammons took off 802 hours of non-FMLA leave, [85] at 8, translates to Ammons having taken off of work 8–9 days of non-FMLA leave per year. This number is not

---

[13] Ammons neglects to explain what it means to be placed on "proof status." Presumably, Ammons means to argue that, had she used a certain number of non-FMLA leave hours, defendants would have required her to offer "proof" of some sort to justify that leave.

so "egregious[ly]" high, *id.*, that a reasonable jury would infer from Bernard's use of that number a willful disregard for whether the number was correct.

Ammons also argues that a jury could find Bernard's behavior suspicious— and thus infer an intent to miscalculate Ammons's attendance score—because Bernard included in her calculations that Ammons took off 39 hours of non-FMLA leave in the 18 months leading up to May 2010. *See id.* at 7, 9. Bernard could not have reasonably believed Ammons to have taken that much non-FMLA leave within the 18-month time period, Ammons argues, because if Ammons had truly taken that much leave, she would have been (but was not) placed on "proof status." *See id.* at 9. Even assuming that Ammons necessarily would have been placed on "proof status" after taking 39 hours of non-FMLA leave—a generous assumption given that Ammons points to no evidence suggesting this is the case—there is no evidence from which a jury might infer that Bernard knew about such a status (or lack thereof) when she performed her analysis in 2010. Nor is there any other evidence to suggest that Bernard should have been dubious of the figures she used when calculating Ammons's attendance score. And thus, there is no reason that a jury would infer from Bernard's use of the "39 hours" that she willfully disregarded a blatant attendance-record error in performing her calculations. *See Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012) (affirming the district court's determination that there was no retaliatory intent where the decision-maker was ignorant of facts needed to form that intent).

Ammons also argues that a jury could infer from the evidence a "retaliatory intent" within the meaning of the FMLA because Kelly Jackson, Chief of Court Services at the Sheriff's Department, attempted to decrease Ammons's chances of receiving a promotion by prejudicing Ammons's interviewers against her. *See* [85] at 5–6.[14] There are two problems with this argument.

First, Ammons points to no evidence that Jackson participated in any decision about whether to promote Ammons. Ammons's composite promotion score was derived from her component scores, including attendance (calculated by Bernard), interview, writing-sample, and written-exam scores. *See* [87] ¶ 20. There is no indication that Jackson played a role in determining any of these individual scores, and it was Kevin Connelly, not Jackson, who calculated Ammons's overall (composite) score, *see* [87] ¶ 28. Absent special circumstances, Jackson's conduct is therefore irrelevant to Ammons's retaliation claim. *See Long*, 585 F.3d at 351 ("[A] plaintiff must generally provide evidence that the *decisionmaker* acted for a prohibited reason to establish a prima facie case of retaliation . . . .") (emphasis added) (citation omitted).

The special circumstance in which Jackson's conduct might be relevant to Ammons's claim is if Jackson "exert[ed] significant influence over the . . . decision" of whether to promote Ammons, *id.*—that is, if Jackson's purported "retaliatory

---

[14] Ammons also claims that Jackson retaliated against Ammons for taking FMLA leave during a separate encounter in 2008. *See* [85] at 5. However, that encounter (discussed *infra*) is irrelevant to Ammons's argument that Jackson tried to prejudice Ammons's interviewers in 2010.

animus" was the "proximate cause of the ultimate employment action" resulting in Ammons not being promoted, *Hicks v. Forest Preserve Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 790 (7th Cir. 2012) (citation omitted); *see also Jajeh v. Cnty. of Cook*, 678 F.3d 560, 572 (7th Cir. 2012) (explaining the "cat's paw" theory of liability for retaliation claims). But Ammons does not argue that the "cat's paw" doctrine applies here, and in any event, the evidence fails to show that it does: even assuming, as Ammons urges, that Jackson attempted to decrease Ammons's chances of being promoted by speaking loudly about Ammons's grievance report within earshot of her interviewers, there is no evidence that the interviewers actually heard what Jackson said (or, if they did hear, that they were at all affected by what they heard). There is no suggestion, in other words, that Jackson's conduct was the "proximate cause" of anything.

The second problem with Ammons's argument concerning Jackson's behavior is that, even to the extent that Jackson's behavior was motivated by animus toward Ammons, there is no indication that Jackson's intent was the kind of "retaliatory intent" required to establish a claim under the FMLA. Retaliatory intent under the FMLA is an intent "to punish [an employee] for requesting or taking FMLA leave." *Nicholson*, 690 F.3d at 828 (citing *Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009)). Here, the facts show: (1) that after taking (and passing) the 2009 promotion exam, Ammons did not immediately receive an interview, [91] ¶ 14; (2) that Ammons then filed a grievance report to complain, *id.*; [87] ¶ 54; and (3) when Ammons filed her grievance complaint, only 15 of the 120 candidates who had

passed the written exam had been contacted about scheduling an interview, and none had yet received one, [87] ¶¶ 55, 57. Even when viewing these facts in the light most favorable to Ammons, the most reasonable inference is that—if Jackson did indeed intend to punish Ammons by speaking loudly near the interviewers—Jackson intended to punish her not for taking FMLA leave, but for having complained about not getting a promotion interview when there was no real cause for complaint.

### iii.    Kevin Connelly

Finally, Ammons argues that a jury could infer from the evidence that defendants intended to retaliate against Ammons for taking FMLA leave because Kevin Connelly calculated and "signed off" on a composite promotion score derived from inaccurately-graded or miscalculated component scores. *See* [85] at 10. More precisely, Ammons contends that a jury would find Connelly's use of her inaccurate component scores suspicious because Connelly knew about Ammons's FMLA status when he computed her overall score, but later testified in his deposition that he had no such knowledge. *See id.* Thus, Ammons argues, a reasonable jury could infer from this inconsistency that Connelly intentionally "concealed" his knowledge that Ammons was using FMLA leave so that he could "deflect attention from his retaliation against" her for having taken such leave. *Id.*

A reasonable jury would not draw any such inference. Aside from the attendance spreadsheet that Bernard provided to Connelly—which indicated that Ammons had taken 332 hours of "FMLA/A" leave, *see* Exhibit 1 to Bernard

Deposition, [74-7] at 1—Ammons points to no evidence demonstrating that Connelly had personal knowledge of Ammons's FMLA status when he computed her composite score.[15] Even assuming that Connelly spotted the "FMLA" reference on the spreadsheet and then testified (more than two years later, *see* [74-4] at 1) that he was not aware of Ammons's status, a reasonable jury would not infer from this inconsistency an intent on Connelly's part to "retaliate" against Ammons for having taken FMLA leave. To reach such an inference, the jury would first have to conclude that Connelly had actually done something to reduce Ammons's chances of receiving a promotion—that is, that he had purposely miscalculated her composite score so as to lower it artificially. But there is absolutely no evidence suggesting that Connelly doctored Ammons's score or otherwise computed it improperly. To the contrary, the evidence indicates that Connelly did nothing but add up the component scores given to him by other personnel. *See id.* at 80:1–:3 (explaining that he "didn't do any evaluation of what the people provided, [he] just recorded numbers"); *see also id.* at 62:15–:19; *id.* at 63:23–64:2.

Ammons argues that several elements of her composite score *other* than her attendance score (such as her writing sample and interview, *see* [91] ¶ 24) were

---

[15] Ammons maintains that Connelly must have known that Ammons was FMLA-certified because: (1) he had in the past approved Ammons's FMLA applications and received memoranda concerning those applications, *see* [87] ¶ 44; [91] ¶ 16; and (2) he had adjudicated (and denied) Ammons's grievance complaint, *see* [91] ¶ 15. However, Ammons points to no evidence indicating that Connelly did, in fact, personally approve her FMLA applications or receive memoranda about them. And indeed, Connelly explained at his deposition that it was Ammons's direct supervisor, not Connelly, who was notified individually about her FMLA status. *See* [74-4] at 47:11–:21. Connelly also explained that, although he did adjudicate her grievance complaint, that complaint alleged a violation of the collective bargaining agreement with Ammons's union, and did not reference the FMLA. *See id.* at 49:4–:18.

"graded inaccurately," and that Connelly's use of those scores suggests retaliation against Ammons for having taken FMLA leave. *See* [85] at 7. Again, however, Ammons provides no support for her contention that any portion of her promotion score was graded inaccurately.[16] The facts, for the purposes of this motion, are that Ammons's writing sample, interview, attendance score, and written exam were each graded or calculated properly, and that Connelly simply added them up according to department procedure to obtain Ammons's composite score. Even when viewing these facts in the light most favorable to Ammons, no reasonable jury would infer from them that Connelly discriminated or retaliated against Ammons for taking FMLA leave.

In short, Ammons has failed to identify evidence suggesting that there is a "causal connection" between her use of FMLA leave and the fact that she was not promoted during the 2010–2011 promotion cycle. To the contrary, the evidence establishes that there is no such connection. Ammons therefore cannot defeat summary judgment on her retaliation claim under the "direct" method of proof.

### b.   Indirect Method of Proof

To prevail on an FMLA retaliation claim using the "indirect" method of proof, the plaintiff must show: (1) that she engaged in activity protected by the FMLA; (2) that she met her employer's legitimate expectations; (3) that she suffered an

---

[16] In support of her assertion that her writing sample and interviews were graded improperly, Ammons refers only to her affidavit, which merely recites the same conclusory allegations without providing any factual support, *see* [91] ¶ 24 (citing Affidavit of Plaintiff, [95-1] ¶ 21). *But see* Fed. R. Civ. P. 56(c)(4) ("An affidavit . . . must be made on personal knowledge [and] set out facts that would be admissible in evidence . . . ."); *Gessert*, 703 F.3d at 1035 ("[C]onclusory allegations devoid of factual support do not preclude summary judgment.") (citation omitted).

adverse employment action; and (4) that she was treated less favorably than "similarly situated employees" who did not engage in FMLA-protected activity. *Caskey*, 535 F.3d at 593 (citing *Nichols*, 510 F.3d at 784–85). Once the plaintiff has established all four elements of her *prima facie* case, the burden then shifts to the employer to show a "non-discriminatory reason for its action." *Id.* (citing *Nichols*, 510 F.3d at 785).

Here, defendants do not dispute that Ammons can establish the first three elements of her *prima facie* case.[17] Defendants argue that Ammons cannot show that she was treated less favorably than other "similarly situated employees" who did not take FMLA leave. *See* [73] at 11–12; [92] at 8–9. Defendants maintain that Ammons cannot establish this element of her *prima facie* case because, of the 22 candidates promoted during the 2010–2011 promotion cycle, 11 had obtained at least one FMLA certification. *See* [73] at 12; *see also* [87] ¶ 62. Moreover, of those 11 individuals, 3 had obtained at least 4 certifications, and one of those 3 candidates had obtained 10 certifications since 2005. *See* [87] ¶ 63.

Ammons does not disagree that candidates with FMLA certifications were indeed promoted, but argues that those promotions still establish indirect proof of retaliation against Ammons because the individuals in question had used *less* FMLA leave than Ammons had used. *See* [85] at 11–12. But Ammons

---

[17] While defendants do dispute that Ammons has "always performed [her job] at a superior level, has an unblemished disciplinary record and has earned an excellent performance record," as Ammons asserts, *see* [91] ¶2, I find that this dispute is immaterial to whether Ammons has "met her employer's *legitimate expectations*," *Caskey*, 535 F.3d at 593 (emphasis added). Defendants do not argue that Ammons has failed to satisfy this element of her *prima facie* case.

misunderstands the relevant test. Under Seven Circuit precedent, the test is not *how much* FMLA leave other "similarly situated employees" have used, but whether they used FMLA leave at all. *See, e.g., Caskey*, 535 F.3d at 593 (noting that the plaintiff must establish that she "was treated less favorably than similarly situated employees *who did not engage in statutorily protected activity*") (emphasis added); *Smith*, 560 F.3d at 702 (observing that the "indirect method . . . requires the employee to produce evidence that she was treated differently from similarly situated employees *who did not request FMLA leave*" (citing *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006)) (emphasis added). The fact that other employees who were promoted to sergeant had also used FMLA leave cannot help Ammons establish her FMLA claim, even if those individuals did in fact use less FMLA leave than Ammons did.

Ammons next argues in the alternative that there were indeed other officers who did *not* use FMLA leave, and who were otherwise similarly situated to Ammons, who were promoted over her. *See* [85] at 12–13. In support of this alternative argument, Ammons describes four such "promoted officers," who purportedly had even less medical leave available to them than Ammons had when the attendance scores were calculated. *See id.* This argument is unpersuasive, however, because Ammons presents no evidence whatsoever indicating that these officers were actually promoted.[18] Moreover, even assuming that the identified

---

[18] In her Rule 56.1 statement, Ammons refers to the same four officers by identification numbers, and cites to three parts of the record in support: (1) Exhibit 1 to the Bernard Deposition, [74-7] at 1–6; (2) paragraph 3 of defendants' response to Ammons's Request for Admission, [95-3]; and (3) Exhibit 7 to the Connelly Deposition, [74-5] at 42–44. *See* [91]

officers *were* promoted, Ammons fails to show how they were "similarly situated" to Ammons.

To establish that other employees were similarly situated, Ammons need not "present a doppelganger who differs only by" having been promoted. *Simpson v. Office of Chief Judge of Circuit Court of Will Cnty.*, 559 F.3d 706, 719 (7th Cir. 2009) (quoting *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008)). However, Ammons must describe similarities enough to "eliminate confounding variables, such as differing roles [or] performance histories." *Id.* (quoting *Filar*, 526 F.3d at 1061). This she has not done. Ammons says nothing about the composite promotion scores (or even the non-attendance-related component scores) of the four individuals she claims were "similarly situated" to herself, except to assert— without support—that none of them "could have earned promotional scores so superior to" hers that they would have attained a higher ranking on the list. Ammons's conclusory assertion is insufficient to establish the described promotion candidates as the "useful comparators" that Ammons needs to defeat summary

¶¶ 28–30. None supports Ammons's contention that the officers described were promoted. First, Exhibit 1 to the Bernard Deposition—the summary spreadsheet prepared by Bernard concerning attendance data—does include the referenced identification numbers, but does not include any indication of which officers were promoted. *See* [74-7] at 1–6. Second, paragraph 3 of defendants' response to Ammons's Request for Admission states only that Exhibit 1 to the Request is a "true and correct copy of the employee attendance and medical leave summary" prepared by Bernard. *See* [95-3] at 1. Presumably, "Exhibit 1" is the same attendance spreadsheet just discussed (the exhibit was not attached to the papers Ammons filed with the Court), and thus does not shed any light on whether the officers described by Ammons were ultimately promoted. Finally, Exhibit 7 to the Connelly Deposition is the rank-ordered promotion list prepared by Connelly. *See* [74-5] at 42–44. The list includes only the name, composite score, and corresponding rank of each candidate eligible for promotion during the 2010–2011 cycle; there is no way to determine from this document whether the four officers Ammons identifies (by number) in her Rule 56.1 statement were actually promoted.

judgment under the indirect method of proof. *See id.* at 720 (concluding that the identified "differences in employment circumstances trump any similarity that might allow a jury to 'isolate the critical independent variable' [needed to] infer that [the plaintiff's] termination was retaliatory" (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008))).

### 2. *The 2008–2009 Promotion Cycle*

The FMLA imposes a two-year statute of limitations on claims brought under the Act. *See* 29 U.S.C. § 2617(c)(1). Here, Ammons filed her original complaint on July 25, 2011. *See* [87] ¶ 7. There are two ways in which an FMLA claim based on the 2008–2009 promotion cycle would be actionable. First, a claim based on the 2008–2009 cycle would be actionable if the "last event" constituting the purported violation took place within the two-year limitations period described above. 29 U.S.C. § 2617(c)(1). ("[A]n action may be brought under this section not later than 2 years *after the date of the last event* constituting the alleged violation . . . .") (emphasis added). In other words, Ammons would have to show that a sergeant-level position became available between July 25, 2009 and October 27, 2009—the date on which the Sheriff's Merit Board certified the 2009 exam results (and thus the date on which the 2007 exam results ceased to be valid), *see* [87] ¶ 14, 16—but that Ammons was denied that particular promotion because she had used FMLA leave. Ammons makes no such argument and presents no such evidence.

Alternatively, an FMLA retaliation claim based on the 2008–2009 promotion cycle would be actionable if the alleged retaliation were shown to be "willful" and to

have taken place after July 25, 2008 (rather than July 25, 2009). *See* 29 U.S.C. § 2617(c)(2) ("In the case of such action brought for a willful violation . . . , such action may be brought within *3 years* of the date of the last event constituting the alleged violation . . . .") (emphasis added).[19] Ammons argues that the three-year statute of limitations does apply in this case, because there are "genuine issues of fact" as to whether Kevin Connelly willfully denied Ammons a promotion. *See* [85] at 10, 13–14. However, the specific actions to which Ammons refers in support of her contention that her 2008–2009 claim is viable are the same actions she describes elsewhere in support of her 2010–2011 claim. In effect, Ammons urges that I consider defendants' actions from two separate promotion cycles to be part of the same, ongoing violation of the FMLA—*i.e.*, a "continuing violation."

a.    The Continuing Violations Doctrine

There are several problems with Ammons's (implied) continuing-violations theory. First, it has not yet been resolved that the continuing-violations doctrine even applies to FMLA claims in the first instance. The doctrine—originally developed in the context of Title VII suits, *see Nat'l R.R. Passenger Corp. v. Morgan*,

---

[19] The Seventh Circuit has yet to define "willful" within the meaning of the FMLA. However, courts in this district typically apply the same knowledge-or-reckless-disregard standard that governs in cases arising under the Fair Labor Standards Act. *See, e.g.*, *Coleman v. Ill. Dep't of Human Servs.*, No. 09 C 3596, 2013 WL 5348314, at *15 (N.D. Ill. Sep. 24, 2013) ("Wilful violations of the FMLA require showing that the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited . . . .'" (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988))); *Wilkes v. Potter*, No. 05 C 4921, 2006 WL 3087097, at *6 (N.D. Ill. Oct. 27, 2006) (similar); *see also Solorzano v. Ry. & Indus. Servs., Inc.*, No. 09 C 3733, 2010 WL 234972, at *2 (N.D. Ill. Jan. 15, 2010) ("The standard for willfulness is either a knowing violation of the FMLA or actions taken with reckless disregard." (citing *McLaughlin*, 486 U.S. 128)).

536 U.S. 101, 115–21 (2002); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707–709 (7th Cir. 2002); *Place v. Abbott Labs.*, 215 F.3d 803, 807–08 (7th Cir. 2000)—provides that component acts of a discriminatory employment practice, even where those acts would otherwise fall outside the statutory limitations period, may still be considered in determining liability if the discriminatory practice "occurs over a series of days or . . . years" such that the practice "cannot be said to occur on any particular day," *Morgan*, 536 U.S. at 115. But whether the doctrine extends to FMLA cases is still an open question. *See Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 11 C 6920, 2012 WL 1802148, at *6 (N.D. Ill. May 17, 2012) (citing *Brenneman v. MedCenter Health Sys.*, 366 F.3d 412, 422 n. 7 (6th Cir. 2004)).

Moreover, even assuming that the continuing-violations doctrine does apply to FMLA claims generally, it still would not support Ammons's argument here—*i.e.*, that defendants' failure to promote her in the 2010–2011 cycle comprises part of the same violation as their failure to promote her in the 2008–2009 cycle. The two cycles cannot form part of the same violation because, under Supreme Court precedent, they are considered "discrete" acts with separate statutory clocks. *See Morgan*, 536 U.S. at 113–14 (recognizing that failures to promote "are not actionable if time barred, even [if] related to acts alleged in timely filed charges," because each such act "starts a new clock for filing charges"); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (affirming the district court's

conclusion that promotion decisions made in 2002, 2006, and 2007, respectively, were "discrete acts" not subject to the continuing-violations doctrine).

Finally, even if defendants' failures to promote Ammons in 2008–2009 and then later in 2010–2011 *could* form part of the same, ongoing employment practice, Connelly's actions during the latter cycle still could not trigger the three-year statute of limitations that would render actionable discriminatory acts occurring in the former cycle. To trigger the three-year statute of limitations, Ammons must show not just retaliation based on her use of FMLA leave, but a *willful* retaliation based on such use. *See* 29 U.S.C. § 2617(c)(2). And, as explained above, Ammons has failed to provide evidence enough to suggest that there was a violation at all during the 2010–2011 promotion cycle—let alone a willful one. Thus, to be actionable under the FMLA, Ammons's retaliation claim as to the 2008–2009 promotion cycle must stand on its own.[20]

### b.    Ammons's 2008 Promotion Interview

Elsewhere in her response brief—though, interestingly, not in support of her argument concerning the three-year statute of limitations—Ammons does refer to events that occurred during the 2008–2009 promotion cycle. Specifically, Ammons describes an interview before Kelly Jackson in 2008, during which Jackson consulted Ammons's attendance record but no other document. *See* [85] at 5; *see also*

---

[20] Ammons effectively concedes that the subject of her complaint is the 2010–2011 promotional cycle, and not prior cycles. *See* [85] at 2 ("This process [of taking promotion exams and being 'passed over' for promotion] has continued and been repeated every two years, through and including [the] 2010 and 2011 promotional period, *which is the subject of the Amended Complaint . . . .*") (emphasis added); *see also* [91] ¶ 4 (same); [95-1] ¶ 4 (similar). However, because Ammons does present elsewhere in her response brief, [85], evidence pertaining to the 2008–2009 cycle, I address that evidence here.

[91] ¶ 11. Ammons argues that Jackson's behavior in 2008 constitutes circumstantial evidence from which a reasonable jury could infer an intent to retaliate against Ammons for her use of FMLA leave. *See* [85] at 5. But Ammons's argument does not follow from the evidence she has presented.

While it is true that, before the SEAM procedures were implemented in 2010, officers seeking promotion were disqualified because of low attendance scores, *see* [87] ¶ 17, Ammons points to no evidence suggesting that, in determining Ammons's attendance score in 2008, defendants counted against her any use of FMLA leave. To the contrary, the undisputed evidence shows that, even before the SEAM was implemented, defendants considered employees' use of FMLA leave a "mitigating circumstance" when assessing employees' attendance records (and, consequently, their candidacies for promotion). *See id.* ¶ 24; *see also* Second Connelly Affidavit, [74-2] at 4 (explaining that FMLA use was considered a mitigating circumstance in offering promotions based on the 2007 written exam). Even when viewing these facts in the light most favorable to Ammons, a reasonable jury would not infer from them an intent to discriminate against Ammons during the 2008–2009 promotion cycle because she had used FMLA leave. And without evidence enough to infer a violation in the 2008–2009 promotion period, a reasonable jury could not find the defendants to have *willfully* violated Ammons's FMLA rights during that time. Consequently, Ammons's FMLA claim, to the extent it pertains to actions taken during the 2008–2009 promotion cycle, is time-barred.

# IV.    Conclusion

Ammons has succeeded in passing a promotion exam on multiple occasions, but has never been promoted. While defendants' decisions not to promote Ammons may be frustrating to her, those decisions did not violate the FMLA. For the reasons discussed above, defendants' motion for summary judgment is granted.

ENTERED:

_____
Manish S. Shah
United States District Judge

Date:  8/20/14